LESCHES LAW
LEVI LESCHES — Cal. Bar No. 305173
5757 Wilshire Boulevard, Suite 535
Los Angeles, CA 90036
Phone: (323) 900-0580
Email: levi@lescheslaw.com

ATTORNEYS FOR
Plaintiff FlightBlitz, Inc., a California Corporation

### IN THE UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| FlightBlitz, Inc., a California Corporation; David Kaye, an individual, formerly doing business as FlightBlitz,<br><br>                Plaintiffs,<br><br>    v.<br><br>TZELL TRAVEL, LLC, a New York limited liability company; TZELL HOLDINGS, LLC, a Delaware limited liability company; TRAVEL LEADERS GROUP, LLC, D/B/A INTERNOVA TRAVEL GROUP a Delaware limited liability company; TZELL TRAVEL GROUP, LLC, a business entity of unknown form;<br><br>                Defendants. | Case No. 2:21-cv-02116-CBM-KES<br>Hon. Consuelo B. Marshall<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>**(1)   CALIFORNIA CARTWRIGHT ACT VIOLATIONS (PRICE FIXING);**<br>**(2)   SHERMAN ACT VIOLATIONS; CLAYTON ACT § 4 (PRICE FIXING)**<br><br>**JURY TRIAL DEMANDED** |

**Plaintiff FlightBlitz Inc., a California corporation, and Plaintiff David Kaye, an individual, f/d/b/a FlightBlitz, demanding a jury trial on all counts, allege:**

## NATURE OF THE CASE

1. This lawsuit arises from Defendants' unlawful attempts to price-fix commissions paid between independent, downstream travel agents.

2. Defendants are Travel Management Companies ("TMC") that "host" independent agents.

3. Travel Management Companies are travel brokers that specialize in selling concierge travel services and experiences, such as first/business-class airfares and vacation packages.

4. Certain TMCs, known as "host" TMCs, or "host agency" TMCs, wholesale travel products and services to smaller agents, with the latter agents retailing those products and services to the consumer.  Travel agencies that purchase from host-agency TMCs are known as "hosted agents."

5. Defendants are "host" TMCs.

6. Plaintiffs, a hosted agency, contends that the Defendants, host-agency TMCs, unlawfully fixed prices by imposing price controls on a commission deal that had been independently negotiated, at arm's length, between two non-owned, downstream hosted agencies.

7. Stated otherwise, Plaintiffs contend that upstream suppliers conspired to increase downstream pricing for retailers.

8. Legal relief is necessary to prevent Defendants from price fixing downstream commissions.

9. Defendants' price fixing harms downstream agents by decreasing sales commissions priced in the free market through deals negotiated at arm's length by downstream agents.

10.    Decreasing agent commissions further harms the broader market by forcing downstream hosted agents and/or independent agents to increase their pricing to consumers in order to compensate for the lost commissions revenues that would otherwise be used towards covering the agents' costs in providing concierge travel services.

## JURISDICTION & VENUE

11.    **Plaintiff FlightBlitz, Inc.** is a California corporation with its primary place of business located in Los Angeles County.

12.    **Plaintiff David Kaye f/d/b/a FlightBlitz** is an individual domiciled in Los Angeles County.

13.    Plaintiff is informed and believes that **Defendant Tzell Travel, LLC,** is a limited liability company organized under the laws of the State of New York and headquartered at 1633 Broadway, New York, NY 10019.

14.    Plaintiff is informed and believes that **Defendant Tzell Holdings, LLC,** is a limited liability company organized under the laws of the State of Delaware and headquartered at 1633 Broadway, New York, NY 10019.

15.    Plaintiff is informed and believes that **Defendant Travel Leaders Group, LLC D/B/A Internova Travel Group,** is a limited liability company organized under the laws of the State of Delaware and headquartered at 3033 Campus Drive, Suite W320 Plymouth, MN 55441.

16.    **Defendant Tzell Travel Group, LLC**, in not registered to business in the State of California and not formed under the laws of the State of California.  On information and belief, Tzell Travel Group, LLC is a name that the other Tzell Defendants transact under.

17.    Federal jurisdiction over this action arises pursuant to § 1331 of title 28 of the *United States Code* because Plaintiffs' claims arise under § 15 of title 15 of the *United States Code*; and under § 1981 of title 42 of said Code.

---

SECOND AMENDED COMPLAINT FOR DAMAGES

18.     Supplemental jurisdiction over Plaintiffs' state-law causes of action arises pursuant to § 1367 of title 28 of the *United States Code*, because Plaintiffs' state-law causes of action form part of the same case and controversy pled under the above-specified federal statutes and regulations.

19.     Federal jurisdiction over Plaintiffs' state-law causes of action further arises pursuant to § 1332 of title 28 of the *United States Code*, because complete diversity exists between the California Plaintiffs and the various foreign Defendants; and Plaintiffs seek, exclusive of costs and interest, more than $75,000.

20.     Because "part of the events or omissions giving rise to the claim" occurred in the Central District for the State of California, venue in this Court is appropriate, pursuant to subdivision (b)(2) of § 1391 of title 28 of the *United States Code*.

21.     Defendants are subject to personal jurisdiction in this district and state because, on information and belief, they knowingly interfered with a pricing agreement between two California entities.

## **GENERAL ALLEGATIONS**

22.     Plaintiff FlightBlitz, Inc. is a hosted concierge travel agent.

23.     In 2019, FlightBlitz changed its form from sole-proprietorship to corporation.

24.     Plaintiff FlightBlitz, Inc. is the successor-in-interest and/or assignee of Plaintiff David Kaye f/d/b/a FlightBlitz.

## INDUSTRY BACKGROUND

25.     Concierge travel is a multibillion-dollar industry that functions through common carriers paying commissions to travel agents—particularly, to "TMC" travel agents—for selling airfare bookings, cruise bookings, and hotel bookings.

26.     These commissions are then used by travel agents to cover their costs in providing concierge services.

27.    Certain consumers, particularly corporate clients and consumers that spend significant sums on travel, desire personalized and highly responsive customized customer service; customer service that preserves institutional memory regarding the client's ongoing needs and preferences; and customer service that provides industry knowledge and sophistication in packaging customized vacation and/or travel and/or corporate retreat packages.

28.    These services are occasionally referred to as "concierge travel services."

29.    Common carriers lack the resources, and the industrywide knowledge, that is necessary for providing concierge travel services.

30.    Common carriers further appreciate that concierge travel agents possess considerable discretion to choose between competing carriers when packaging vacation experience and travel packages for their clients and high-income travelers.

31.    Common carriers therefore compete for business from concierge travel agents, through, amongst other matters, offering commissions to concierge travel agents and particularly to TMCs.

32.    When a client purchases travel through a concierge travel agent, the common carrier then often pays a portion of the consumer's retail price to the travel agent as a commission.

33.    Accordingly, common carriers use commissions as a means for competing in selling their largely undifferentiated services (*e.g.*, a first-class airfare from New York to London).

34.    Commissions paid by common carriers subsidize the services, amenities, customer agents, and other conveniences provided by concierge travel agencies. Absent common-carrier commissions, concierge travel fees would need to be significantly higher than the market pricing that is based on commission subsidization.

35.    Higher booking fees and agent fees would, in turn, lock out consumers that currently utilize, and benefit from, concierge travel services.

36.    These commissions further compensate concierge agents for providing knowledgeable, personalized, and highly-responsive customer service to corporate clients and high-spend travelers.

37.    Without commissions, concierge agents would need to impose exorbitant booking fees, or monthly/annual fees, in addition to the pass-through costs of services sold.

38.    Not every concierge travel agent negotiates directly with the various common carriers.

39.    Because a concierge travel agent selling $1 million in annual travel sales generally lacks the bargaining power necessary for obtaining the commission levels provided to agents selling $1 billion in annual travel, smaller concierge travel agents therefore usually transact under "host agencies."

40.    Host agencies aggregate their own sales volumes together with the sales volumes of smaller travel agents that operate under that host.

41.    Under this arrangement, the host agent receives, as a result of boosting its purchasing power through bundling smaller agents, more competitive commissions.  By aggregating its own purchasing power with the purchasing power of its hosted agents, the host agency's bargaining power is boosted in negotiating commissions, and overrides commissions, with common carriers.

42.    The hosted agent also benefits from the host's greater bargaining power. The hosted agent gains access to commission levels that the hosted agent would not obtain using its sole purchasing power.

43.    The hosting agent also obtains value through "commission splits," and/or retained override commissions, which are percentages retained by the hosting agency on hosted-agency sales.

44.    Commission contracts from air carriers generally provide for two distinct types of commissions: regular commissions, and overrides commissions.

45.    Regular commissions are flat percentages earned on sold tickets.

46.    Overrides commissions are contingent commissions that are *not* automatically earned on sold fares, but that are only paid after certain threshold sales levels and/or market-share levels and/or volume levels have been surpassed on defined routes.

47.    Sales volumes are particularly important for increasing a TMC's market-share-dependent override commissions and volume-dependent override commissions.

48.    Hosted agents do not necessarily receive the commission amounts provided for in the common-carriers' contracts with the hosting agency.  Separate agreements between the host agency and the hosted agency will define the "commission split" between them.

## DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET

49.    Defendants TLG and Tzell possess considerable power in the relevant market of "TMC host agencies for air."

50.    TMC Host agencies can specialize in air-travel contracts, cruise contracts, hotel contracts, other travel specialties, or any combination of these categories.

51.    From the perspective of the relevant consumer—namely, the *hosted* travel agency—it is only one market in the host agency's portfolio (whether air, cruise, or hotels) that decides the *hosted agency*'s election on whether to join the host.

52.    This is because *hosted* travel agencies generally specialize in only one travel category—whether air, cruises, or hotels—and not in all three.

53.    Accordingly, from the perspective of a hosted agency selling airfares,

the relevant market is TMC host agencies for air.

54.    From the perspective of a hosted agency, TMC host agencies for cruises constitute a distinct market.  This is because a hosted retail agency selling cruises cares little about a hosting agency's commission rates and clout in the air or hotel markets.  The hosting agency's commission rates and clout in the air or hotel markets are irrelevant to the hosting agency's competitiveness in air travel commissions.

55.    Similarly, a hosted retail agency selling air travel or hotel stays cares little about a hosting agency's commission rates and clout in other markets.

56.    After decades of furious mergers, the TMC host agencies for air market has been concentrated in the hands of four to five companies, of which Defendants are the unrivaled behemoth.

57.    Market concentration in the market is illustrated, for instance, by Travel Weekly's "2019 Power List."

58.    Travel Weekly is a premier industry publication in the travel agency business.  Travel Weekly publishes an annual list—the "Power List"—profiling the industry's largest titans.

59.    Of the 35 largest travel agencies in the world, only fifteen provide host services to smaller agents.

60.    The 2019 Power List provides the following statistics for the largest host agents in the United States market in 2018[1]:

    a.  Flight Center Travel Group (USA) — #6

        i.  $16 billion total sales

        **ii.  $1.2 billion air sales**

---

[1] This list does not include host agencies with less than 50 hosted agents, or with less than $50 million in annual sales placed through hosted agents.  Avoya and World Travel Holdings are also excluded from the list, because those host agencies have minimal volumes in air sales.

   **iii.  700 hosted agents**

  b.  Travel Leaders Group — #7

   i.  $7.12 billion total sales

   **ii.  $3.37 billion air sales**

   **iii.  52,000 hosted agents**, with a combined $3.7 billion in annual sales

  c.  Frosch — #14

   i.  $2.25 billion total sales

   **ii.  $1.3 billion air sales**

   **iii.  860 hosted agents**

  d.  Ovation Travel Group — #16

   i.  $1.4 billion total sales

   **ii.  $0.9 billion air sales**

   **iii.  260 hosted agents,** with a combined $0.2 billion in annual sales

  e.  Travel Store — # 30

   i.  $.45 billion total sales

   **ii.  $.19 billion air sales**

   **iii.  192 hosted agents**, with a combined $0.1 billion in annual sales

  f.  Travel Experts — # 34

   i.  $.4 billion total sales

   **ii.  $.1 billion air sales**

   **iii.  456 hosted agents**, with a combined $0.4 billion in annual sales

  g.  Travel Planners International — # 35

   i.  $.38 billion total sales

   **ii.  $.026 billion air sales**

   **iii.  3,912 hosted agents**

61. These companies effectively comprise the entire market for hosted

SECOND AMENDED COMPLAINT FOR DAMAGES

travel agents selling air.

62.   Travel Planners International is the lowest tier for hosted agents.  Travel Planners International's hosted agents average less than $100,000 in annual sales; *i.e.*, less than 10% of the $1,000,000 average per-agent sales for Ovation-hosted agents.

63.   On information and belief, the above-listed entities account for nearly the entire hosted-agent market in the United States.

64.   Travel Leaders Group and/or Tzell accordingly control 85% of hosted agents associated with a major host agency.

65.   Travel Leaders Group and/or Tzell also control the hosted-agent market in terms of total air sales.

66.   Even if it were *unrealistically* assumed that every *non*-TLG hosted agent could match Ovation's average of $1,000,000 in per-agent sales, TLG's hosted agent sales would still account for approximately 28% of *all* hosted agent sales.

67.   Defendants, as the largest host agencies in the market of TMC host agencies for air—outstripping the nearest competitor by more than 10 to 1 in terms of hosted agents; and being one of the only three US TMC host agencies with more than $1 billion in annual air sales—could safely reduce its commission payments (*i.e.* raise prices) without incurring any material risk of losing hosted agents to Ovation or Frosch.

## DEFENDANTS WERE SITUATED UPSTREAM TO PLAINTIFFS IN THE CARRIER-TO-CONSUMER CHAIN

68.   Defendants Tzell Travel, LLC and/or Tzell Holdings, LLC, (hereinafter referred to, collectively, as "Tzell"), is, according to Tzell's website, "ranked first among the nation's largest corporate travel management companies . . . ."

69.   Tzell has offices in 20 states.

70.    Tzell is a brand of Defendant Travel Leaders Group, LLC d/b/a Internova ("TLG").

71.    TLG other brands include Protravel, Altour, and Nexion.

72.    On information and belief, Tzell acts as a hosting agent for Tzell branches, as well as for Tzell's numerous other hosted agencies.

73.    On information and belief, TLG hosts most of its brands (Tzell, Protravel, Nexion, etc.).  In other words, on information and belief, the TLG brands negotiate collectively with common carriers, rather than negotiating independently.

74.    The supply chain might be *roughly* characterized as follows (arrows representing the path of airline tickets from common carrier to consumer):



75.    The above illustration is a rough illustration of how *air tickets* move to consumers.

76.    The above illustration is not representative of ownership.  For instance, Travel Leaders Holdings, LLC owns Tzell.

77.    In a nutshell, this action alleges that Tzell and TLG conspired to force ASTG to pay lower commissions to Plaintiffs, in order to prevent Plaintiffs from competing against Tzell in recruiting lower-level ICs.

78.    Relevantly hereto, Tzell partially owned ASTG, but ASTG's controlling executive was ASTG's minority shareholder.

79.    Relevantly hereto, TLG did not own ASTG, and neither ASTG, nor any Defendant, owned any interest in Plaintiffs.

80.    Accordingly, no *Copperweld* defense arises.


TZELL/TLG WERE NOT A SINGLE ECONOMIC UNIT WITH ASTG

81.    Tzell and/or TLG competed with ASTG in numerous ways.

82.    First, as a preliminary matter: this entire case arises from ASTG's attempts to compete with Tzell.

83.    Prior to joining ASTG, FlightBlitz was a Tzell contractor.

84.    ASTG, in direct competition to Tzell, and causing financial loss to Tzell, successfully moved FlightBlitz away from Tzell to ASTG, causing Tzell to lose the 30%–20% commissions it had been previously earning on FlightBlitz's sales.

85.    During FlightBlitz's year as an ASTG IC, and, particularly, in the beginning half of 2019, there was a very strong antagonistic culture at ASTG towards Tzell.

86.    The culture in ASTG's office was: "we compete with Tzell."  "Don't share our secrets with Tzell; they are the competition." "they are going to steal our methods and secrets, in order to steal agents."

87.    At the time, ASTG was particularly focused on building itself into the premiere branch for ICs to join.  ASTG was specifically seeking to offer services that would make it, ASTG, a more attractive branch for ICs to join than Tzell.

88.    Although Tzell and ASTG worked in close proximity, Tzell employees were specifically excluded from ASTG meetings, due to ASTG's intention and efforts to develop methods and products that would encourage ICs to join ASTG, rather than Tzell, thereby enabling Odaka to earn greater profits through ASTG obtaining commission splits on the greater sales volumes generated by an ever-growing cadre of ICs.

89.    ASTG ICs were explicitly warned not to share with Tzell information regarding the methods and products ASTG was developing.

90.    Odaka made numerous statements to Kaye that Tzell was jealous of his success.  Odaka made these statements despite acknowledging that Tzell had a non-management equity interest in ASTG.

91.    Odaka represented to Kaye on various occasions that ASTG, and not Tzell, was the tenant on the lease for their office space; and Odaka went so far to tell Kaye, "if I want, I can kick them out of the [11111 Santa Monica] suite."

92.    Odaka also discussed with Kaye, in the course of conversations, how Odaka was making efforts to disassociate from Tzell, so that ASTG would no longer need to represent itself as a "branch of Tzell."  Odaka would express that he viewed ASTG as superior to Tzell, and therefore Odaka did not want ASTG held out as ancillary to Tzell.

93.    Tzell and ASTG even had two employees in direct competition with each other: Jim Garcia was Tzell West's then-director of IC recruitment and Susan Duffy was ASTG's then-director of IC recruitment.  Duffy and Garcia were literally tasked with competing with each other.

94.    Garcia had secret meetings with FlightBlitz in late 2018, in which Garcia

pitched having Tzell poach FlightBlitz back from ASTG. As alleged herein, ASTG had poached FlightBlitz from Tzell just six months prior.

95. Garcia expressed that such meetings should be kept secret from Odaka.

96. There were various other ways that ASTG's and Tzell's economic competitiveness manifested.

97. For instance, Tzell sought to prohibit ICs from negotiating new commission contracts directly with airlines for routes the being served by the IC but for which routes the airline(s) had not entered into commission contracts with Tzell. ASTG, however, encouraged FlightBlitz to seek such contracts, despite Tzell's disapproval.

98. Odaka, in an email to Kaye, described that he had always wanted to start direct negotiations with airlines, and that he wanted to "combat" Tzell's control over that market.

99. ASTG, as alleged below, entered a deal for ASTG to have access to FlightBlitz's tour contracts. ASTG specifically sought to have Tzell excluded from access to those competitive contracts.

100. Similarly, FlightBlitz was in a meeting with an airline where the airline representatives waited until all the Tzell representatives left the room before commencing discussion regarding a contract the airline was providing to ASTG specifically, and which Tzell was not provided.

101. Tzell and ASTG were not only competitors, they also entered into conflicting exclusive deals with different hotel networks. Tzell was contracted with Signature hotels; ASTG was contracted with Virtuoso. It was represented to Kaye that Virtuoso and Signature are exclusive networks, and agents with access to the one were precluded from having any access, whatsoever, to the other, and that ASTG and Tzell ICs needed to be kept strictly segregated from accessing the other's hotel network.

---

SECOND AMENDED COMPLAINT FOR DAMAGES

## PLAINTIFFS TRANSACTED DOWNSTREAM FROM DEFENDANTS

102.   Tzell and/or TLG allow their numerous branches and/or hosted agents to sell airfares under Tzell and/or TLG's airline contracts.

103.   Tzell and/or TLG pays commissions to those branches at rates negotiated between the branch and Tzell and/or TLG.

104.   On information and belief, Tzell, alone, has approximately fifty-four "branch" travel agencies ("branches").

105.   On information and belief, Tzell's branches are generally independently owned; or, alternatively, partially owned.

106.   Tzell's branches, in turn, allow *the branch's* own subsidiaries, affiliates, and independent contractors (green boxes) to access the *branch's* (yellow boxes) contract, at rates negotiated between the branch and that downstream agent ("Independent Contractor").

107.   Those Independent Contractors can then, in turn, provide their own respective subsidiaries, affiliates, and independent contractors access to their contract rate (*i.e.*, sale from green box to green box); and so on.

108.   For instance, if Tzell were to negotiate 40% commissions[2] on a Pan Am airline fare, then a $10,000 fare purchase might be split as follows:

- Pan Am Airlines: $6,000 (minus applicable overrides).
- Tzell receives $4,000.

109.   Assuming the booking branch has an 80%–20% contract with Tzell; and that the branch has 80%–20% contracts with its own ICs; and that those ICs have 80%–20% contracts with their own ICs; etc., then the $4,000 will then be split as follows:

---

[2] The "80-20" commission split is a relatively common arrangement between agents. However, the exemplar that is used for carrier-paid commissions—40%—is not representative, and grossly exceeds the average carrier-paid commission.

SECOND AMENDED COMPLAINT FOR DAMAGES

- Tzell will retain $800 (20% on $4,000) and pass $3,2000 to Hosted Branch "A".

- Hosted Branch "A" will retain $640 (20% on $3,200) and pass $2,560 on to Hosted IC "B".

- Hosted IC "B" will retain $512 (20% on $2,560) and pass $2,048 on to Hosted IC "C".

- Hosted IC "C" will retain $409.60 (20% on $2,048) and pass $1,638.40 on to Hosted IC "D", the agency that actually sold the fare to the consumer.

- Hosted IC "D" receives $1,638.40.

**FIRST CAUSE OF ACTION**

**CARTWRIGHT ACT CLAIMS — VERTICAL PRICE FIXING**

**By Plaintiff FlightBlitz, against Defendants Travel Leaders Group, LLC, Tzell Travel, LLC, and Tzell Holdings, LLC**

110.   Plaintiffs were injured when Tzell and TLG (red boxes) conspired with a hosted agent, nonparty All Star Travel Group (yellow-box level), to fix prices on airfare commission splits Plaintiff had independently negotiated with All Star Travel and.

111.   FlightBlitz was formerly an Independent Contractor ("IC") under nonparty All Star Travel Group ("ASTG"), a California-based business entity of unknown form.

112.   ASTG was an independent branch of Tzell.

113.   In late 2017, FlightBlitz—then a Tzell hosted agent acting under an IC (i.e., non-branch) contract with Tzell—sought to negotiate larger commission percentages ("commission splits") on its airfare sales.

114.   Nonparty ASTG shared at that time office space with FlightBlitz.

ASTG, witnessing FlightBlitz's remarkable operations and growth, aggressively solicited FlightBlitz's business.  ASTG sought to lure the large airfare volumes associated with FlightBlitz's significant and growing book of business.

115.   Kaye f/d/b/a FlightBlitz shared office space with All Star Travel Group ("ASTG").

116.   Through such shared resources, Kaye and Odaka, ASTG's principal, developed a friendly relationship, and Kaye and Odaka extensively discussed their market experience and market opportunities.

117.   Through such discussions, Odaka came to appreciate Kaye's familiarity with, and knowledge regarding, software and technological resources, alternative purchasing avenues for travel products, and travel-ancillary products.  Neither Odaka, nor any others at ASTG, could match such industry knowledge.  Conversely, Kaye appreciated that Odaka had a customer base and business connections that FlightBlitz could not match.  Kaye and Odaka further developed a strong personal and professional relationship.  Kaye and Odaka often discussed that that they could attain mutually beneficial business advantages through working together.

118.   On February 18, 2018, Odaka invited Kaye to a meeting at Odaka's residence.

119.   Kaye, at the time, was a Tzell IC.  Kaye believed that Odaka intended to discuss developing a software platform they had been discussing for some time.

120.   Instead, at the meeting, Odaka and Kaye agreed for FlightBlitz to leave Tzell as a Tzell IC and join ASTG as an ASTG IC.

121.   It was explicitly discussed, and understood, that ASTG sought to capitalize on Kaye's expertise in air travel in order to enable ASTG to compete with Tzell and ASTG.

122.   By way of background: Tzell and TLG are the unrivaled market leaders in "hosting" "hosted travel agents" for air travel.

SECOND AMENDED COMPLAINT FOR DAMAGES

123.   Nevertheless, Tzell and TLG are much like the taxi industry in that they are complacent, nonattentive to developing new technologies to keep ahead of Uber-like upstarts, and, even in their attempts to develop such technologies and opportunity, Tzell and TLG had have checkered success.

124.   Odaka told Kaye, numerous times, that Tzell and TLG "did not get" the IC market.  It should be noted that, as alleged prior, the "IC market" was, and is, Tzell and TLG's bread-and-butter business.

125.   Kaye agreed with Odaka's assessment.

126.   Odaka, accordingly, sought to capitalize on the areas that Tzell and TLG neglected: namely, building a services-and-technology oriented platform that would attract ICs to ASTG's umbrella.

127.   In practical terms, Odaka sought to, amongst other matters: (1) create advanced training modules and seminars that would allow ICs to obtain access to various travel platforms, (*e.g.*, Virtuoso Hotels); (2) create new software platforms that would allow travel agents to access multiple booking systems simultaneously, and in synchronization, so that travel options could be reviewed in a fraction of the time as compared with existing technology; (3) create a forum where executive-level travel experts would be available to answer IC questions; (4) create an onboarding process where ICs could add new employees in hours, as opposed to the industry-standard two-to-three weeks; (5) create what would later become to be known as the "Travel Genius Desk," (intended as direct competition to TLG's "Revenue Management Desk"), a hotline response team for responding to immediate IC inquiries regarding pending transactions; and (6) creating a set of exclusive agent rates and other exclusive perks for personal use by ASTG agents and ICs; and other such programs.

128.   At the February 18, 2018, meeting in Odaka's residence, Kaye expressed interest in moving from Tzell as an IC to ASTG, but only if ASTG could

offer competitive terms.

129.  Prior to the February 18, 2018, meeting in Odaka's residence, FlightBlitz had been working on creating a syndicate of ICs that would enable FlightBlitz to obtain higher commissions.

130.  Prior to the February 18, 2018, meeting in Odaka's residence, FlightBlitz had been building a syndicate of hosted ICs.

131.  FlightBlitz had been organizing those ICs' sales volume into a purchasing block, which would provide bargaining power to obtain better commission pricing for FlightBlitz, which FlightBlitz could then pass-on as increased commissions to the ICs that joined FlightBlitz's syndicate.   FlightBlitz worked with another hosted agent, Global First Travel ("GFT"), to secure better commissions for the syndicate FlightBlitz was organizing.

132.  At that time—*i.e.*, in February 2018—GFT was an IC of Carlisle Travel Management ("Carlisle").

133.  Carlisle was, and is, a Tzell branch.

134.  Prior to the February 18, 2018, meeting in Odaka's residence, FlightBlitz had negotiated with Jerry Saxe, Carlisle's Vice President of Sales, that in exchange for FlightBlitz's promise to deliver Carlisle $10 million in additional annual sales volume, Saxe would provide FlightBlitz 100% on direct commissions, with Carlisle only taking overrides commissions on FlightBlitz's sales.

135.  At the February 18, 2018, meeting in Odaka's residence, Odaka sought for Kaye to join ASTG.

136.  Such negotiations were facially contrary to any notion that ASTG and Tzell operated as a "single economic unit"; ASTG's position in the February 18, 2018, meeting was one of open competition with Tzell, seeking to have Kaye move away from Tzell—with Tzell taking 20% on all commissions earned by FlightBlitz—and join ASTG, to the loss of those commission to Tzell.

137. At the February 18, 2018, meeting in Odaka's residence, Kaye advised Odaka that FlightBlitz had already secured favorable terms, and that Kaye did not believe Odaka could price match those terms.

138. Odaka told Kaye not to be presumptuous and to divulge the competing favorable terms, so that Odaka could determine whether ASTG could price match.

139. Kaye advised Odaka that: (1) FlightBlitz had obtained an offer for 100% on direct commissions, in exchange for promising $10 million in annual sales; and that (2) if FlightBlitz was going to turn down the Carlisle deal and go with ASTG, ASTG needed to offer 100% on direct commissions *as well as* 50% on overrides commissions.

140. Kaye advised Odaka that the reason he had not accepted Carlisle's offer immediately, and the reason FlightBlitz was "still in the market," was because FlightBlitz was holding out to see if it could obtain a 100% direct + 50% overrides deal. Kaye advised Odaka FlightBlitz would only provide an immediate commitment to an offer providing for 100% direct + 50% overrides commissions.

141. In response, Odaka advised FlightBlitz that ASTG would offer the commissions sought by Plaintiffs, if Plaintiffs delivered $10 million in annual sales.

142. Although the $10 million in annual sales was expressly a foundational condition to FlightBlitz being offered 100% on direct commissions as well as 50% on overrides commissions, it was clearly expressed in the February 18, 2018, meeting that the purpose of the offer to FlightBlitz was not solely motivated by the promised sales volume; and that ASTG's interest in FlightBlitz was significantly motivated by ASTG's interest in recruiting FlightBlitz's team to join the Travel Genius Desk, participate in the software initiative, act as a key consultant for ASTG's IC chat group, and support ASTG's business plan to build a better IC infrastructure that would allow ASTG to dominate recruitment of ICs, to the detriment of other Tzell branches and Tzell's own IC business.

143.   Indeed, Odaka initially sought to have FlightBlitz's Kaye serve as a co-Director of IC recruitment.

144.   On February 18, 2018, at that same meeting, Kaye and Odaka agreed to the price terms, and Kaye and Odaka shook hands.

145.   On about February 20, 2018, Odaka advised Kaye that he had discussed the deal with Tzell's Chris Griffin (VP, Branch Relations) and Gail Grimmett (CEO), and TLG's Peter Vlitas (Executive Vice President).   Odaka advised that Tzell's management had advised him that FlightBlitz was actually receiving substantially less commissions under the FlightBlitz–Tzell IC agreement.   Tzell advised Odaka that ASTG had been conned into offering too much.

146.   In response, Kaye disclosed to Odaka the anticipated arrangement that had been previously negotiated between FlightBlitz and Carlisle.

147.   Armed with that information, Odaka advised TLG's executive team that FlightBlitz had indeed secured an alternative competitive offer indirectly through Carlisle, and that Odaka therefore needed to outbid the amount FlightBlitz would receive from the Carlisle deal.

148.   Odaka returned unsuccessful.  Odaka explicitly advised Kaye that Gail Grimmett and Peter Vlitas were "not letting him do the deal."

149.   Odaka explained that he had been advised that only the "big boys" received the "big" deals, and "New York" was refusing to approve the deal terms.

150.   Odaka was apologetic, and repeatedly acknowledged that a "deal is a deal"; that he was a man of his word; and that he had shaken hands on the deal.

151.   At that meeting, or about February 24, 2018, Odaka told Kaye that he had full control over ASTG.  Odaka told Kaye that "he could do whatever he wanted with ASTG's contract," that "his lawyers were very clever, and they ensured that he retained full control over his company" despite selling Tzell a majority equity stake, that "he did not need anyone's permission" to give FlightBlitz a 100% commission

deal; that even if Tzell's management objected, "he had the final say" in what ASTG did.

152.   Odaka explained that even though he had full legal capacity to authorize a 100% deal between ASTG and FlightBlitz, he was, nonetheless, concerned about being "blacklisted."

153.   Odaka explained to FlightBlitz that Tzell were the kingpins of airfare sales—for instance, it is understood that Tzell is Delta Airlines biggest customer—and that Tzell had the power to ensure that a "blacklisted" agent would never be able to build a business in the retail airfare space.

154.   Odaka represented that Tzell had a history of blacklisting "undesirables," by advising airlines, hotel networks, and other key providers of travel services not to negotiate with a blacklisted agent.

155.   A blacklisted agent would effectively be relegated to, at best, being nothing more than a permanent IC under some competing network (such as Frosch or Ovation).  If an agent was blacklisted from working with Tzell branches, and further blacklisted from access to even one or two key hotel networks or airlines, an agent would be permanently crippled from building up a successful competing agency.

156.   These representations seemed somewhat fanciful to Kaye at the time. Since such time, however, such representations have been corroborated.

157.   For instance, when Tzell purchased Odaka's interests in ASTG and terminated FlightBlitz, Tzell further banned all Tzell and TLG branches from working with FlightBlitz.

158.   Next, Tzell went out of its way to recruit FlightBlitz's ICs away from FlightBlitz.

159.   Next, Tzell engaged in a campaign of defamation against FlightBlitz, falsely telling numerous counterparties that FlightBlitz worked with—despite the

complete absence of any basis in fact or reality—that FlightBlitz had left Tzell with $250,000 in unpaid bills.

160.   Others have also corroborated Odaka's representations.

161.   To quote from the Third Amended Complaint in *Meyaart v. Travel Leaders Group, LLC*, S.D. Fl., 9:18-cv-80257-RLR:

> [V]arious male-only members of upper management at TLG participated in what was referred to by some as the "Godfather Stripper Dinners (or 'Parties')" at which very senior male-only members of various major airlines were treated to private dinners at an Italian restaurant where female strippers appeared to provide various forms of entertainment. Mrs. Meyaart and other women at TLG were excluded. To the extent such events contributed to the relationships between male executives at TLG with male management at very important business partners/clients, and females at TLG were excluded from having business development opportunities, including, but not limited to Mrs. Meyaart, those women were professionally and economically disadvantaged and handicapped.
>
> In another illustrative event, a Travel Leaders Group's affiliate, featuring its CEO/President, Barry Liben, conducted a shameless event parodying the song, "Love Shack," and highlighted staff in risqué sexually focused costumes, a female dominatrix in tights with a whip on a conference room table, and a male and female employee coming out of a company ladies room with the man pulling up his zipper. This video was posted on YouTube.

162.   The allegations in the *Meyaart* action are consistent with the way that Odaka described Tzell to Kaye on or about February 24, 2021.

163.   In a nutshell, Odaka represented that he had full authority under his contracts to give the 100%/50% deal; that he had promised to provide the 100%/50% deal and he was a man of his word and an honorable person; but he did not want to risk upsetting the cartel—or, to use the work Odaka used, the "mafia."

164.   Initially, Kaye was upset with Odaka, and told Odaka the deal was off.

165.   Odaka, however, pitched the alternative deal structure that eventually became the ASTG–FlightBlitz contract.

166.   Odaka represented that he would be able to convince TLG to **agree** to a

---

SECOND AMENDED COMPLAINT FOR DAMAGES

commission structure that allowed TLG to collect 10% commissions up to $5 million in sales and 5% commissions to TLG for the next $2.5 million in sales.

167.  FlightBlitz agreed that ASTG's second offer would continue to be more competitive than the offer by Carlisle/Saxe, because after $7.5 million in sales, FlightBlitz would be making 50% on overrides and not merely 100% on commissions.

168.  Odaka pitched the revised offer to TLG's principals between February 24, 2021 and March 1, 2021.

169.  There was continued resistance, and Odaka advised Kay that he needed to make at least five phone calls to secure consent.

170.  Odaka specifically identified Peter Vlitas of TLG and Gail Grimmett of Tzell as those opposed to providing the sought commissions.

171.  Thereafter, TLG's principals approved the reduced commissions, subject to additional caveats.

172.  Odaka represented that to obtain TLG and/or Tzell's approval, Odaka had portrayed to Vlitas the 90%/95%/100% commission splits as a necessary concession ASTG had to make so that ASTG could obtain access to "tour fare contracts" that FlightBlitz had in certain air markets.

173.  ASTG had no independent SABRE access to tour fare contracts; nor any knowledge, expertise, or familiarity with how tour contracts operate.  FlightBlitz's tour fare contracts, as well as FlightBlitz's industry knowledge on how to utilize tour contracts, allowed FlightBlitz to purchase fares on certain routes at approximately 40%–70% of ASTG best-available pricing under its TLG-hosted contracts.

174.  Prior to the FlightBlitz's March 2018 contract with ASTG, ASTG would purchase tour fares through FlightBlitz.  FlightBlitz would sell those fares to ASTG for a significant discount off retail and keep the difference.

175.  FlightBlitz objected to Odaka's added condition, because the parties'

initial agreement was that ASTG would not obtain access to FlightBlitz' tour fares and that FlightBlitz could continue profiting from reselling tour fares to ASTG.

176.   Odaka explained, in the period between February 24, 2018 and March 31, 2018, that Odaka's hands were tied, because "New York" had warned Odaka, during that same time period, that Odaka was at risk of being "blacklisted" in the air-retail industry were Odaka to exercise his contractual rights as the sole manager in ASTG and enter into an agreement—which was sought and desired by Odaka—to pay to FlightBlitz 100% of commissions received by ASTG on FlightBlitz's sales.

177.   Odaka also advised Kaye that he, Odaka, saw the potential in Kaye, but that New York viewed Kaye as "not the right type," and "New York" generally did not provide 100% contracts to agents who were not the "right type."

178.   The Defendants' conduct, accordingly, squarely falls within the core class of anticompetitive agreements that the Sherman Act was enacted to proscribe.

179.   Odaka explained to Kaye that he had been strongarmed, through the threat of boycott, into raising prices.  Odaka specifically explained that: (1) Odaka sought to provide more competitive pricing (particularly because, as explained above, Odaka nearly lost FlightBlitz to Carlisle); (2) Odaka had full contractual authority to provide that competitive pricing; and (3) Odaka expressed that he had been threatened with extracontractual boycott behaviors.

180.   The formal FlightBlitz–ASTG contract was signed shortly later.

181.   A Carlisle IC, Global First Travel ("GFT") left Carlisle to join FlightBlitz as a FlightBlitz IC.  Saxe kicked up a significant ruckus within Tzell about GFT being "poached" by ASTG.  Saxe threatened to sue ASTG.

182.   However, Odaka advised Kaye and GFT that Saxe could do nothing about it, because, shortly prior, and completely unrelatedly, Tzell had advised its branches that "poaching" between branches was authorized.

183.   Such threats to sue, between Tzell branches, was similarly inconsistent

with any notion of such branches operating as a single economic unit.

184.    After FlightBlitz joined ASTG, Odaka and Kaye had numerous conversations regarding Tzell and/or TLG's anticompetitive behaviors.

185.    Odaka warned Kaye, numerous times, that FlightBlitz needed to voluntarily pay 5% of profits—*i.e.*, that branches paid noncontractual "homage" of hundreds of thousands of dollars annually—so as to be elevated into the "boys club" (*i.e.*, invitations to godfather stripper parties).  Odaka also warned Kaye that failing to pay homage would carry negative repercussions for Kaye in the long term.

186.    Odaka constantly likened the arrangement to the "mafia," would refer to Defendants' management as being "literally like the mafia."

187.    As a result of TLG and/or Tzell's interference, FlightBlitz was forced to provide ASTG access to tour fares, even though the parties' initial oral contract had provided for FlightBlitz to retain independent control and pricing in reselling tour fares to ASTG, which would have otherwise resulted in significant profits for FlightBlitz.

188.    But for TLG and/or Tzell's interference, FlightBlitz would have retained independent control and pricing in reselling tour fares to ASTG.

189.    Under *Mailand v. Burckle* 20 Cal. 3d 367, 377 (1978), this agreement to restrain prices offered on the open market, made between entities that did not share 100% common ownership, constituted a *per se* violation of the Cartwright Act.

190.    Plaintiff was damaged in a sum to be proven at trial, but no less than an additional $120,000; or $360,000 under the Cartwright Act's mandatory trebling penalty. *Prior* to becoming an ASTG IC, FlightBlitz was a Tzell independent contractor (*i.e.*, not a Tzell branch).

191.    The Defendants are all subject to Cartwright Act liability.

192.    As stated, prior to FlightBlitz's contract with ASTG, FlightBlitz was a Tzell IC.

193.   Pursuant to FlightBlitz's pre-ASTG dealings with Tzell, Tzell and FlightBlitz entered into a written agreement on or about October 22, 2015, which provided that "[t]his [a]greement will be governed by the laws of the State of New York, whose state and federal courts have exclusive jurisdiction and venue over any matter arising hereunder."  The written agreement contained no survivorship clause, and the written agreement provided that it could be "changed, deleted or modified by the parties at any time by a written agreement between them."

194.   The venue clause in the October 22, 2015 Tzell Agreement is not applicable to this action, because *no* claims herein relate to that Agreement. FlightBlitz's claims herein relate to Tzell and TLG's unlawful conspiracy to fix pricing between FlightBlitz and ASTG in a contract that did *not* relate to the 2015 Tzell Agreement.

195.   FlightBlitz further alleges that the venue clause in the October 22, 2015 Tzell Agreement is not applicable to this action, because, amongst other matters, under *Rincon EV Realty LLC v. CP III Rincon Towers, Inc*., 8 Cal.App.5th 1 (2017); *AT&T Mobility LLC v. AU Optronics Corp*., 707 F.3d 1106 (9th Cir. 2013); *Butler v. Adoption Media, LLC*, 486 F.Supp.2d 1022, 1052 (N.D. Cal. 2007); and *Muldoon v. Tropitone Furniture Co*., 1 F.3d 964, 965 (9th Cir. 1993), California's strong public policies against price fixing and against tying require applying California law to this dispute.

196.   FlightBlitz further alleges that the venue clause in the October 22, 2015 Tzell Agreement is not applicable to this action, because, amongst other matters, Tzell terminated the agreement in writing, and no survivorship clause protects the venue provision.

197.   FlightBlitz further alleges that the venue clause in the October 22, 2015 Tzell Agreement is not applicable to this action, because, amongst other matters, Tzell's characterization of its contract may result in the forum-selection clause being

avoided under section 20040.5 of the *Business & Professions Code*.

## SECOND CAUSE OF ACTION

## CLAYTON ACT CLAIMS — VERTICAL PRICE FIXING

### By Plaintiff FlightBlitz, against Defendants Travel Leaders Group, LLC, Tzell Travel, LLC, and Tzell Holdings, LLC

198.   The above-described price-fixing agreement further constituted an unlawful conspiracy in restraint of trade in violation of section 1 of the Sherman Act.

199.   Because Defendant Tzell and TLG, in conspiring to restrain open pricing, had a naked motive to inflict anticompetitive injury and to prevent FlightBlitz from obtaining access to a contract that could allow FlightBlitz to compete directly against Tzell and TLG; and because, on information and belief, Tzell and TLG lacked any procompetitive justification for their attempt to control downstream pricing, Tzell and TLG's conduct is anticompetitive and actionable under federal "quick look" analysis. *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 898–99 (2007) (courts may use "presumptions where justified, to make the rule of reason a fair and efficient way to prohibit anticompetitive restraints"); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 109 (1984).

200.   There is significant of evidence of anticompetitive motive by Defendants.

201.   For instance, Odaka advised Kaye that his 100%-commissions offer violated TLG's "unwritten rules," and that "verbal agreements" forbade branches from offering deals exceeding 80%.

202.   According to Odaka, there was a very strong expectation from Tzell and TLG that FlightBlitz—just like any other branch—would not offer more than 80% to any of FlightBlitz's own ICs.  Branches were expected to conform with Tzell and/or TLG's unwritten standards protecting their image as the alpha entities with greatest

pricing power.

203.   According to Odaka, Tzell and/or TLG operated "literally like the mafia," and that if anyone ran afoul of "The Boys' Club," they would be blacklisted. Odaka warned that Tzell and/or TLG used boycott tactics to attack the reputations of blacklisted agents and damage their business.

204.   Indeed, when Tzell acquired a 100% state in ASTG, and then proceeded to terminate the ASTG–FlightBlitz contract, Tzell and/or TLG began implementing an anti-FlightBlitz boycott by forbidding Tzell and/or TLG's branches and ICs from doing business with FlightBlitz, as well as with entities that had *relationships* with FlightBlitz.

205.   Aside from the financial and reputational injuries inflicted against FlightBlitz, the very act of giving those boycott instructions further telegraphed, to all branches and ICs receiving those boycott directives, that failing to conform with Tzell and TLG's unwritten anticompetitive rules risked a similar boycott against themselves.

206.   Furthermore, when Kaye discussed the terms of FlightBlitz's ASTG contract with Tzell's Don Jones, Jones became visibly irate to learn that ASTG had offered such terms. "Odaka," said Jones in reaction, "is a minority owner in a minor branch." Jones's comment further confirmed the existence of unwritten Tzell and/or TLG cartel rules, forbidding minor branches from offering major contracts.

207.   Furthermore, even without applying "[justified] presumptions" for "mak[ing] the rule of reason a fair and efficient way to prohibit anticompetitive restraints," *Leegin Creative Leather Prods. v. PSKS, Inc*., 551 U.S. 877, 898–99 (2007)—*i.e.*, even applying full rule of reason analysis—Defendants' price-fixing conspiracy constituted an actionable and unlawful restraint on trade.

208.   Travel Leaders Group and/or Tzell also control the hosted-agent market in terms of total air sales. Even if it were *unrealistically* assumed that every *non-*

TLG hosted agent could match Ovation's average of $1,000,000 in per-agent sales, TLG's hosted agent sales would still account for approximately 28% of *all* hosted agent sales.

209.    Accordingly, even applying a full rule of reason analysis, there is a *prima facie* showing that Defendants engaged in anticompetitive price fixing.

210.    Tzell and/or TLG, as the largest host agent in the market—outstripping the nearest competitor by more than 10 to 1 in terms of hosted agents; and being one of the only three US TMC host agencies with more than $1 billion in annual air sales—could safely reduce its commission payments (*i.e.* raise prices) without incurring any material risk of losing hosted agents to Ovation or Frosch.

211.    Furthermore, the multibillion-dollar annual air-sales volumes generated by the "big three"—TLG/Tzell, Frosch, and Ovation—demonstrates that considerable barriers to entry protects TLG/Tzell's market dominance and anticompetitive behavior.

212.    Furthermore, *Leegin's* "dealer cartel" exception applies because the price-fixing agreement at issue is not a top-down vertical agreement, but a *mid-supply chain* vertical agreement.

213.    The alleged violation is not a *Leegin* agreement between Manufacturer A and Wholesaler B to set the minimum price offered by Retailer C in selling Widget to Consumer D.

214.    The alleged violation is, instead, a *mid*-supply chain conspiracy setting the price at which to offer an easily-obtainable, undifferentiated product.

215.    The very ability to fix prices at the distributorship level on an easily-obtainable, undifferentiated product creates an automatic inference of market power.

216.    For instance, an agreement between a water utility and its contractor to set a price floor on the contractor's delivery rates would prove, in and of itself, the existence of market power sufficient for exacting monopolistic rents.  This is because

water is an easily-obtainable, undifferentiated product, and, absent market power by the parties conspiring to fix price, competitors would rapidly overtake the market through selling the precisely-equivalent, undifferentiated product—water.

217.   Tzell/TLG's ability to dictate maximum commission levels on TMC-brokered airfares accordingly demonstrates, in and of itself, that Tzell and TLG possessed sufficient market power for restraining commissions being offered downstream.

218.   Furthermore, because Tzell and TLG were fixing price on a middleman transaction, no procompetitive justification can exist.

219.   There is no known procompetitive justification for setting price-flooring restrictions on the sales made by middlemen to retailers.  The naked purpose of such requirement is to prevent downstream purchasers from competing with upstream sellers.

220.   Furthermore, TLG and Tzell's actual motive in capping downstream commissions was to eliminate direct competition against TLG and Tzell.  TLG and Tzell's verbal agreements were aimed at limiting downstream independent agents from offering larger commissions than TLG and Tzell were willing to offer.  The price-fixing agreement was, accordingly, a horizontal agreement not to compete, constituting a *per se* violation under *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990), and *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

221.   Plaintiff was the direct victim of the above-described price-fixing conspiracy, and for such reason, amongst others, Plaintiff has antitrust standing. *Brennan v. Concord EFS, Inc. (In re ATM Fee Antitrust Litig.)*, 686 F.3d 741, 748 (9th Cir. 2012).

222.   Plaintiff is entitled to recover under § 4 of the Clayton Act three times 10% commissions on sales less than $5 million; and three times 5% commissions on

all sales between $5 million to $7.5 million; together with prejudgment interest and mandatory attorneys' fees.

223.    Plaintiff was damaged in a sum to be proven at trial, but no less than $54,446.17; or $163,338.51 under the Clayton Act's mandatory trebling penalty.

224.    Plaintiff was damaged in a sum to be proven at trial, but no less than an additional $120,000; or $360,000 under the Cartwright Act's mandatory trebling penalty.

## **PRAYER FOR RELIEF**

Plaintiff FLIGHTBLITZ, INC., a California corporation, accordingly prays for the following relief against TZELL TRAVEL, LLC, a New York limited liability company; TZELL HOLDINGS, LLC, a Delaware limited liability company; TRAVEL LEADERS GROUP, LLC, a Delware limited liability company;

(1)    For all compensatory, consequential, general, and special damages incurred, in such amount as proven at trial; but no less than $163,338.51;

(2)    For trebled damages under the Cartwright Act and Unruh Act;

(3)    For all attorneys' fees incurred;

(4)    For all costs of suit;

(5)    For penalties, as authorized by statute;

(6)    For prejudgment and postjudgment interest;

(7)    For injunctive relief;

(8)    For such other and further relief as the Court deems just and proper.

Dated: December 10, 2021          **LESCHES LAW**


　/s/ Levi Lesches
Levi Lesches
Attorneys for Plaintiff FlightBlitz, Inc.

1

2                        **— JURY DEMAND —**

3   Plaintiff hereby demands a jury trial with respect to all issues triable by jury.

4

5   Dated: December 10, 2021              **LESCHES LAW**

6

7                                          ___/s/ Levi Lesches_____

8                                          Levi Lesches
                                           Attorneys for Plaintiff FlightBlitz, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28